1   William L. Buus (SBN 180059)
    Leslie F. Vandale (SBN 238823)
2   SCHIFFER & BUUS APC
3   4675 MacArthur Court, Suite 590
    Newport Beach, California 92660
    Telephone:   (949)825-6140
4   Facsimile:   (949)825-6141
    Email:        wbuus@schifferbuus.com
5
6   Attorneys for Defendants
    Velox Enterprise, Inc., Dominic Chang,
7   and Spiral Group, and Defendant/Counterclaim
    Plaintiff Ixion Industries Corporation

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

| | |
|---|---|
| 11  PROTECH WHEEL INDUSTRY CO. LTD, | Case No.:  CV09-4049 JHN (SSx) |
| 12 | **DEFENDANTS AND** |
| Plaintiff, | **COUNTERCLAIM-PLAINTIFF'S** |
| 13 | **TRIAL BRIEF** |
| 14   vs. | Trial Date:   August 30, 2011 |
| 15  VELOX ENTERPRISES, INC., a | Time:          8:30 a.m. |
| California Corporation as successor in | Location:     790 Roybal |
| 16  interest to IXION INDUSTRIES | |
| CORPORATION, dba Velox | |
| 17  Automotive Group, a California | |
| Corporation, and DOES 1 through 10, | |
| 18  inclusive, | |
| 19           Defendants. | |
| 20  AND RELATED COUNTERCLAIM | |
| 21 | |

22       TO ALL PARTIES, THEIR ATTORNEYS OF RECORD AND TO THIS

23   HONORABLE COURT:

24          Defendants and Counterclaimants Velox Enterprises Inc. and Ixion Industries

25   Corporation dba Velox Automotive Group, Spiral Group and Dominic Chang

26   (hereinafter, "Defendants") hereby submit their Trial Brief as follows.

27   ///

28   ///

1

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

# I.

## INTRODUCTION

In this action, Plaintiff Protech Wheel Industry Company Limited ("Protech") claims that it manufactured and sold goods – specifically wheels – to Defendants Velox Enterprises, Inc. ("Velox") and Ixion Industries Corporation ("Ixion"), and that Velox and Ixion did not pay for the goods as agreed. Protech has sued Velox and Ixion for breach of contract and goods sold and delivered.  Velox and Ixion deny they breached the contract and claim they do not owe Protech for the goods due to non-delivery and untimely delivery.  In addition, Ixion has filed a counterclaim against Protech for breach of contract, claiming that Protech's constant delays in deliveries of wheels caused it to suffer a loss of profits.  Protech denies that it breached the contract and denies that Ixion has suffered any loss of profits.

As set forth in its counterclaim, Ixion has been harmed by the willful, bad faith conduct of Counterclaim Defendant Protech in performing under the agreement at issue.  Protech delayed its deliveries to Ixion, sometimes holding deliveries hostage in an effort to renegotiate contract terms, knowing that Ixion's customer, Falken Tire Corporation (hereinafter "Falken"), needed the goods in a timely manner and that Ixion desired to keep Falken happy.  This conduct caused Ixion to lose Falken's business, and lose sales and profits totaling $3,209,625, which is supported by the report and supplemental report of Ixion's damages expert.  These damages far exceed, and offset, the damages claimed by Protech.

## II.

## SUMMARY OF FACTS

### A. MARCH 2001 AGREEMENT

In March 2001, Protech entered into an agreement with Velox Enterprises, Inc. for the sale and delivery of after-market automotive wheels.  Protech claims that it manufactured and delivered wheels to Velox and that Velox failed to pay in full.  In its Amended Complaint, Protech claims damages in the amount of $450,000.00 in unpaid

2

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

invoices.  Velox denies that it failed to pay that amount and further denies that any amount is owed because of Protech's constant and significant delays in shipping the wheels to Velox.  Because of these delays, Velox was unable to sell the wheels to its customers.  This material breach of the agreement relieved Ixion of any obligation to perform under the agreement.

**B. <u>NOVEMBER 2002 AGREEMENT</u>**

In November of 2002, Ixion and Protech entered into a Manufacturing Agreement (hereinafter "the 2002 Agreement"), whereby Protech agreed to manufacture and Ixion agreed to buy wheels that were to be ultimately sold by Ixion to Falken.

On October 21, 2002, Ixion and Falken entered into a written, signed agreement, whereby Ixion agreed to provide and Falken agreed to purchase, wheels.  The term of this agreement was originally three years, but was later extended in writing to September 8, 2007.  The term was to be extended once again to January, 2011, but due to delivery delays, Falken declined to extend the contract.

While the Falken Agreement was being performed, the practice of Falken was to provide Ixion with a forecast of future orders.  In early April, 2005, due to certain price concessions made by Ixion, Falken agreed to purchase a minimum of 16,000 wheels per month.  This was embodied in a series of email exchanges between Falken's representative, Darren Thomas, and Ixion's representative, Linda Liu.  It was based upon these forecasts, among other things, that Ixion's expert calculated Ixion's lost profits.

At the deposition of Falken's person most knowledgeable taken September 21, 2010, Richard Smallwood testified as to the wheel industry and Falken's business relationship with Ixion as follows:

> "It's a difficult business.  It's a timely business.  It's almost like high fashion, where wheels have a life cycle of about a month and then that style is no longer valid."

(Smallwood Depo, 30:9-12.)

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

1    "Q.    Do you remember ever having an issue with the delivery of
2    shipments?
3    "A.    Consistently.  I will say that there was – in order to be fair, I
4    would say there was a consistent frustration, staring from the very first order
5    on getting wheels, very first order."
6    (Ibid., 39:23-40:3.)
7    ". . . I'm being told, 'Yes, yes, yes. Your wheels are going to be here on
8    time.' I'm going to the marketplace, telling dealers I'm go to have wheels on
9    time.  Wheels are not there on time.  And it makes me look like an idiot to my
10   parent company.   It makes me look like an idiot to the dealers.   And that
11   seemed like a consistent problem, consistent problem.
12   (Ibid., 40:4-21.)
13   "Q.    Do you remember when you started to discuss exiting the
14   business?
15   "A.    I won't be lighthearted here.  I'll be serious.  Probably the first
16   receipt of orders.  . . .We found out early on, the wheel business was much
17   more difficult to manage because of the challenges.  So you know, in terms of,
18   again, receiving product timely, having it, you know – having the right style at
19   the right time.
20   (Ibid., 49:5-8, 14-18.)
21   "Q.    You indicated there are various different factors. . . one of which
22   was the timeliness of shipment and receiving your product .  How much of a
23   factor would you say that was in your decision to exit the wheel market?
24   "A.    . . . It was one- - we were having a hard time being successful
25   because we didn't get the wheel in time.  So if the high fashion season – and
26   you'd have to be shipping those things in February, March – if we did not have
27   a wheel on time, then it would be late.  So either we would lose some of our
28   dealers' business completely or just get a smaller portion of it.

4

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

1  (Ibid., 174:2-6; 174:15-22.)

2        While Ixion and Protech were performing under the 2002 Agreement, Protech
3  delayed shipments, sometimes purposefully in an effort to gain leverage to re-
4  negotiate the terms of the 2002 Agreement, such as price terms.  Linda Liu was in
5  constant contact with individuals at Protech, such as Thunder Lei, concerning these
6  delays and the purposes of those delays.  Every time a shipment was delayed, Linda
7  Liu would communicate with Protech, both by email and telephone calls, and urge it
8  to get the shipments to Ixion on time.  Linda Liu did this numerous times, knowing
9  that Ixion's client, Falken, needed the goods on a timely basis.  It was extremely
10 important to Ixion that the shipments be on time, and Linda Liu communicated this
11 to Protech numerous times.  Not once did Linda Liu ever advise Protech that it could
12 deliver product to Ixion late, or that Ixion wouldn't care that such deliveries were late.
13 In fact, the penalty provisions of the 2002 Agreement, as amended, were meant to
14 motivate Protech to timely perform under the agreement, not to compensate Ixion
15 for any damages caused by delay.

16       While it is true that Ixion did accept the late-delivered goods, it did so in order
17 to preserve the business relationship with Falken.  Changing manufacturers during the
18 performance of the 2002 Agreement would not have been easy, and would have
19 involved significant expenditures of time, money and effort.  It would have taken
20 several months and, in fact, that's how long it took Ixion to find a replacement
21 manufacturer after Protech refused to perform under the terms of the 2002
22 Agreement.  Before the first shipment from a new manufacturer, Ixion would have
23 had to identify potential manufacturers, meet with them, determine whether they
24 could meet Ixion's needs and on terms that would be agreeable to both parties, select
25 a manufacturer, negotiate the manufacturing agreement, provide the manufacturer
26 with information so that they could start tooling and creating molds, assist it with
27 gearing up for the manufacturing process, and obtain product samples.  This is not
28 something that can be done easily and quickly and at little expense.

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

Although the business relationship between Ixion and Protech was rocky and sometimes strained, Ixion invested a lot of time, money and effort in that relationship strived to preserve it so that there would be no significant delays in shipping goods associated with seeking an alternate manufacturer, and so that there would be no further disputes or lawsuits between Ixion and Protech.  Ixion's President, Dominic Chang, as well as Linda Liu decided that it would better serve Ixion's financial interests, and the interests of Falken, to work with Protech than to turn their backs on Protech, disavow the contract, cease dealing with Protech, and find another manufacturer.

## III.

## ARGUMENT RE MARCH 2001 AGREEMENT

### A. DAMAGES

Protech's Amended Complaint contends that Velox failed to pay $450,000.00 for goods shipped to Velox.  However, Protech's damages claim is unsupported by the evidence.  The December 15, 2010 report of Protech's expert, Joseph Tseng , contains no opinion as to the amount of Protech's damages or any such calculation, noting that *Velox* failed to provide sufficient documentation of their payments to Protech.  However, Protech, not Velox, bears the burden of proving its damages, and Protech failed to set forth any evidence of the basis for its damages claim.

While Velox has admitted that certain invoices were not paid or not paid in full, Velox's refusal to pay was due to Protech's material breach in delaying shipments to Velox which left Velox unable to sell the wheels to its customer.  Moreover, the total unpaid amount is far less than $450,000.00.  Thus, Protech cannot prove that it has sustained damages in the amount of $450,000.00.

### B. WAIVER

In addition to the material breach by Protech, Protech's claims are also barred on the basis of waiver.  Waiver is the intentional relinquishment of a known right after knowledge of the facts.  *City of Ukiah v. Fones*, 64 Cal.2d 104, 107 (1966).  Protech

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

knew that Velox was obligated to pay and freely and knowingly gave up its right to performance of the obligation.  Protech continued to take purchase orders and ship wheels to Velox despite the purportedly outstanding payments.

## C. MITIGATION

A party injured by a breach of contract is required to do everything reasonably possible to negate his own loss and thus reduce the damages for which the other party has become liable.  *See Brandon & Tibbs v. George Kevorkian Accountancy Corp.,* 226 Cal.App.3d 442 (1990); CACI 358.  Here, Protech has not offered any evidence demonstrating that it made reasonable efforts to mitigate its damages, such as by finding another buyer for the wheels or refusing to accept additional orders when it was unable to meet the demand and ship timely.

## D. OFFSET

Finally, to the extent Protech can establish it is entitled to any damages arising from Velox's purported breach of the March 2001 Agreement, the damages are offset by the significant damages incurred by Velox under the November 2002 Agreement, as set forth in detail below.

## E. <u>ALTER EGO CLAIM BY PROTECH AGAINST SPIRAL GROUP AND DOMINIC CHANG</u>

In its Amended Complaint, Protech seeks to impose liability for the alleged breach of contract on individual defendant, Dominic Chang, who is not a party to the March 2001 Agreement.  Protech's theory of alter ego liability is based upon the fact that Chang is sole shareholder of Ixion, Velox and Spiral Group and Protech's contention that Chang failed to maintain corporate distinctions and failed to maintain corporate formalities.  In general, the two requirements for applying the alter ego doctrine are that (1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice.  *Webber v. Inland Empire Investments*, 74 Cal.App.4th 884, 900 (1999)

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

1   citing *Communist Party v. 722 Valencia, Inc.*, 35 Cal.App.4th 980 (1995). The alter ego

2   claim is an equitable one and is not a matter for jury decision. *Webber*, supra, at 908;

3   *Siegel v. Warner Bros. Entertainment, Inc.*, 581 F.Supp.2d 1067, 1076 (C.D. Cal. 2008)

4   ("alter ego claim is one sounding in equity to which no right to a trial by jury existed

5   at common law").

6        Despite the fact that Dominic Chang is the sole shareholder of the defendant

7   entities, alter ego liability should not attach in this case, because Protech cannot

8   establish evidence of either prong of the claim. Chang's corporate entities have

9   maintained corporate formalities and there is no evidence that maintenance of the

10  corporate entities would promote fraud of injustice to Protech.

11                                        **IV.**

12                  **ARGUMENT RE NOVEMBER 2002 AGREEMENT**

13       **A.    DAMAGES**

14       Protech's main argument is that Ixion's alleged lost profits are speculative.

15  Where the trier of fact has found that plaintiff has suffered damage, the amount of

16  damages to be awarded need not be based upon absolute certainties. *GHK Associates*

17  *v. Mayer Group*, 224 Cal.App.3d 856, 873-74 (1990). The law requires only that some

18  ***reasonable basis*** of computation of damages be used, and damages may be

19  computed even if the result reached is an approximation. *Id.* This is especially true

20  where it is the wrongful acts of the defendant that have created the difficulty in

21  proving the amount of loss of profits or where it is the wrongful acts of the defendant

22  that have caused the other party to not realize a profit to which that party is entitled.

23  *Id.* Moreover, where there is an established business, damages are recoverable for the

24  loss of prospective profits resulting from the breach of contract since the working

25  experience of the business affords a reasonable method of determining the loss and

26  such damages are therefore not speculative and uncertain. *Mann v. Jackson*, 141

27  Cal.App.2d 6, 11 (1956).

28       In the present case, aside from evidence showing that Falken canceled its

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

1  business relationship with Ixion because of Protech's breaches, Ixion has also

2  provided reasonable bases for the computation of its loss of profits.  The report of

3  Ixion's damages expert describes these reasonable bases thoroughly.

4        The business relationship between Falken and Ixion was not merely fanciful or

5  theoretical; it was a reality, involving past contracts, past dealings, and

6  communications relating to Falken's estimated future purchases from Ixion.

7  Specifically, the reasonable basis for Ixion's calculations include, not only its

8  previously-executed agreement with Ixion and past dealings, but an email from Falken

9  to Ixion, setting forth the number of wheels it expected to buy.  This evidence, among

10  other things, served as the reasonable bases for the expert's calculations of damages

11  which, as argued above, were caused by Protech's delivery delays and refusals to

12  perform under the 2002 Agreement.

13  **B.   CAUSATION**

14        Protech also argues that Ixion's alleged lost profits are speculative because

15  Falken had decided to exit the wheel industry for a number of reasons.  The argument

16  is primarily one of causation; that is, whether Ixion's lost profits were caused by

17  Protech's breaches or were caused by other factors influencing Falken's decision to

18  leave the market.

19        Undoubtedly, Ixion must meet its burden of proof and persuasion that

20  Protech's breach of the 2002 Agreement caused it to suffer damage.  *See Troyk v.*

21  *Farmers Group, Inc.,* 171 Cal.App.4th 1305, 1352 (2009).  Richard Smallwood, whom

22  Falken designated as its person most knowledgeable for deposition in this action,

23  testified that the delivery delays were, in fact, a cause of Falken's decision to exit the

24  wheel industry and to terminate its business relationship with Ixion.

25        The test for causation in a breach of contract action is whether the breach was

26  a "substantial factor" in causing the damages.  *U.S. Ecology, Inc. v. State of California*, 129

27  Cal.App.4th 887, 909 (2005); *Bruckman v. Parliament Escrow Corp.*, 190 Cal.App.3d 1051,

28  1063-64 (1987); CACI 430.  The phrase "substantial factor" has no precise definition,

9

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

but it seems to be something which is more than slight, trivial, negligible, or a theoretical factor in producing a particular result.  *U.S. Ecology, supra,* 129 Cal.App.4th at 909.

Thus, Ixion need not prove that Protech's breach was the **only** factor in producing the harm, but whether Protech's breach was a "substantial factor" in producing the harm.  As shown above, the testimony of Falken's principal shows that Protech's breaches were a substantial factor in causing Falken to cancel its business relationship with Ixion, thereby causing Ixion to lose sales and profits.  .

## C.   **MITIGATION**

Protech next argues that Ixion cannot prove that it made any attempt to "cover" its losses as required under the California Commercial Code.  Protech cites to both sections 2705 and 2712 of the California Commercial Code for the proposition that a buyer is required to "cover" (i.e., buy replacement goods to sell to its customer).  Section 2705 relates to a seller's stoppage of delivery in transit and is clearly not applicable.  Section 2712 does, in fact, relate to "cover," but by its express terms the "[f]ailure of the buyer to effect cover . . . does not bar him [or her] from any other remedy."  Cal. Comm. Code section 2712(3).  Thus, any alleged failure of Ixion to "cover" does not bar it from recovering damages under other provisions of the California Commercial Code, as Protech argues.

Where the seller fails to deliver goods or repudiates the contract for the sale of goods, the buyer may, at its election, "cover" and have damages under California Commercial Code section 2712 or recover damages for non-delivery under California Commercial Code section 2713.  Cal. Comm. Code section 2711(1).  Under section 2713, buyer may recover, among other things, his or her consequential damages for non-delivery or repudiation.  Cal. Comm. Code section 2713.  That is what Ixion is claiming here.  Such consequential damages include "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by

10

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

cover or otherwise; and (b) Injury to person or property proximately resulting from
any breach of warranty."  Cal. Comm. Code section 2715(2).

Thus, the concept Protech is attempting to articulate is that all consequential
damages Ixion is claiming could have mitigated by "cover" and, as such, its claim for
breach of contract fails. As shown above, simply because Ixion did not "cover" does
not prevent it from seeking and recovering consequential damages.  Ixion may not,
however, obtain an award of consequential damages to the extent such damages could
have been avoided, or mitigated, by "cover."  The issue Protech poses is really one
involving Ixion's conduct in mitigation of its damages, and not one involving whether
Ixion simply "covered."

It is true that a party injured by a breach of contract is required to do
everything reasonably possible to negate his own loss and thus reduce the damages for
which the other party has become liable.  *See Brandon & Tibbs v. George Kevorkian
Accountancy Corp.,* 226 Cal.App.3d 442 (1990).  The injured party is not precluded from
recovery, however, to the extent that he made reasonable but unsuccessful efforts to
avoid loss.  *Id.*

It is also well established that, while the burden of proving the extent of loss
incurred by way of consequential damages rests with the injured party, California
Commercial Code section 2715(2)(a) imposes upon the allegedly breaching party the
burden of proving the inadequacy of efforts to mitigate consequential damages.  *Green
Wood Indus. Co. v. Forceman Intern. Dev. Group, Inc.,* 156 Cal.App.4th 766, 773-774 (2007);
*Carnation Co. v. Olivet Egg Ranch,* 189 Cal.App.3d 809, 818-819 (1986).  Therefore, in
this case, while the burden rests on Ixion to prove the amount of its consequential
damages, the burden rests on Protech to show the extent to which Ixion did not
mitigate its damages.

Additionally, Protech cannot argue that, because Ixion failed to mitigate some
of its damages, Ixion is precluded recovery of all consequential damages, even those
which reasonably could not have been avoided.  *Carnation, supra,* 189 Cal.App.3d at

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

818, n.12.  A party's failure to take reasonable steps to mitigate damages bars recovery of only the avoidable portion of the damages, not all damages.  *Id.*

The only evidence Protech has that Ixion failed to mitigate its damages is that it failed to "cover" and continued to do business with Protech despite Protech's repeated breaches.  This evidence alone cannot be sufficient to bar Ixion from all damages suffered and claimed in this action.

Ixion, on the other hand, has shown that its efforts to mitigate were reasonable, albeit unsuccessful.  Ixion constantly attempted to work with Protech in an effort to preserve the relationship, to avoid litigation, and to avoid expending the time, money and expense in locating and gearing-up a new manufacturer, which would have taken months.  Ixion was in constant communication with Protech about delays, urging Protech to deliver the goods in a timely manner and sometimes demanding contractually-created penalties for such delays.  These efforts were, in fact, attempts at mitigation.  Once Ixion lost its customer, Falken, due to delivery delays, Ixion had no other opportunities to mitigate its damages.  At that point, the damage was done.

### D.   <u>WAIVER</u>

Finally, Protech argues that Ixion waived any right it had to timely performance under the 2002 Agreement.  Protech argues that, because Ixion continued to accept and pay for the late-delivered goods, Ixion waived any right it would otherwise have to timely deliveries of such goods.

The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver.  *City of Ukiah v. Fones*, 64 Cal.2d 104, 107 (1966); CACI 336.   Because waiver is a question of fact and not of law, the intention to commit a waiver must be ***clearly expressed***.  *Moss v. Minor Properties, Inc.*, 262 Cal.App.2d 847, 857 (1968).  Thus, Protech must prove by clear and convincing evidence that Ixion intentionally relinquished its right to the timely delivery of goods.  Protech has failed to do this for several reasons.

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

First of all, section 5.06 of the 2002 Agreement provides the following: "Nonwaiver.  The failure of either Party at any time to require performance of the other Party of any provision of this Agreement shall not affect in any way the full right to require such performance at any time thereafter."

Furthermore, the fact that Ixion accepted late-delivered goods does not, in and of itself, show by clear and convincing evidence that Ixion intentionally relinquished its right to timely delivery.  Protech has failed to show Ixion's alleged intent to commit a waiver was clearly expressed.  This is particularly so in light of section 5.06 of the 2002 Agreement.

As mentioned above, Ixion constantly attempted to work with Protech in an effort to preserve the relationship, to avoid litigation, and to avoid expending the time, money and expense in locating and gearing-up a new manufacturer.  Ixion was in constant communication with Protech about delays, urging Protech to deliver the goods in a timely manner and sometimes demanding contractually-created penalties for such delays.  These efforts show that Ixion did not intentionally relinquish any right to timely performance and, in fact, desired timely performance.

## V.

## CONCLUSION

As a result of the foregoing, Defendants and Counterclaim Plaintiff will be asking for a verdict and judgment in their favor.

Respectfully submitted,

Dated:  August 23, 2011

SCHIFFER & BUUS APC

By:/s/ William L. Buus                .

William L. Buus
Attorneys for Defendants/
Counterclaim Plaintiff

13

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 23, 2011, I electronically filed the foregoing DEFENDANTS AND COUNTERCLAIM-PLAINTIFF'S TRIAL BRIEF with the Clerk of the Court using ECF which will send notification and a copy of such filing to the following persons:

Henry C. Wang, Esq.
Baute Crochetiere & Maloney LLP,
777 South Figueroa Street, Suite 4900
Los Angeles, CA 90017
Telephone: 213.630.5000
Email: hwang@bautelaw.com

Executed on August 23, 2011, at Newport Beach, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ *Leslie F. Vandale*                .

Leslie F. Vandale

14

DEFENDANTS AND COUNTERCLAIM PLAINTIFF'S TRIAL BRIEF